**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. _____ |
| Plaintiff, | |
| v. | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |
| PEPSICO, INC., | |
| Defendant. | |

**COMPLAINT FOR PERMANENT INJUNCTION**

## I.    NATURE OF THE CASE

1.    In 1936, Congress passed the Robinson-Patman Act ("RPA") to help level a playing field that favored chain stores and other large enterprises over small businesses. The law prohibits price discrimination and other ways that large businesses may gain an unfair advantage. Section 2(d) of the RPA generally prohibits sellers of products or commodities from granting advertising and promotional allowances to their customers unless the same allowances are available to all competing customers on proportionally equal terms. Section 2(e) of the RPA generally prohibits sellers from furnishing services or facilities connected with the processing, handling, sale, or offering for sale of commodities upon terms not accorded to all purchasers on proportionally equal terms. Together, Sections 2(d) and 2(e) are intended to prevent sellers from evading prohibitions on price discrimination by using other methods, like promotional allowances or services, to favor large customers over smaller businesses.

2.    Defendant PepsiCo, Inc. ("Pepsi") is the second-largest beverage and processed food company in the world. For years, Pepsi has violated Sections 2(d) and 2(e) of the RPA by

working to advantage Walmart, Inc. ("Walmart")—one of the largest retailers in the world—over Walmart's competitors in the resale of Pepsi soft drinks.

3.    Pepsi recognizes Walmart as its most important customer. In its 2023 10-K filing with the SEC, Pepsi told investors that losing Walmart as a customer "would have a material adverse effect" on all of Pepsi's business. To keep Walmart happy, Pepsi provides Walmart with promotional payments, allowances, and services while failing to make similar benefits available to Walmart's competitors on proportionally equal terms.

4.    This conduct has disadvantaged retailers who compete with Walmart in the resale of Pepsi soft drinks across the United States, including family-owned neighborhood grocery stores, local convenience stores, mid-tier grocers, and independent retailers. The competition that these retail businesses provide is a critical component of the American economy and offers valuable alternatives that benefit consumers and communities. Pepsi's practice of providing promotional payments, allowances, and services to Walmart without making those benefits available to Walmart's competitors on proportionally equal terms denies these other retailers the chance to compete fairly against Walmart for the resale of Pepsi soft drinks.

5.    Pepsi works with Walmart to create a retail "price gap" or "price hedge" between Walmart and its competitors, or in other words, to give Walmart lower average retail prices than its competitors. The purpose of the price gap is to provide Walmart with an advantage over its brick-and-mortar competitors in the resale of Pepsi soft drinks to the consumer. Pepsi's ordinary course documents reflect a "foundational commitment" to provide Walmart with this price gap: "Delivering on Walmart hedge commitments is an aligned commercial strategy" across Pepsi. As one internal Pepsi email explains, "stay[ing] focused on our price gap . . . is how we win with Walmart—[w]e stay focused on our deliverables and commitments."

6.      To influence retail prices, achieve the Walmart price gap, and advantage Walmart in the resale of Pepsi soft drinks, Pepsi relies on several potential levers. Pepsi selectively (1) provides Walmart with promotional payments and allowances intended to reduce Walmart's retail prices for Pepsi soft drinks, (2) reduces promotional payments and allowances to other retailers in an effort to nudge their retail prices for Pepsi soft drinks above Walmart's, and (3) raises wholesale prices to non-Walmart retailers.

7.      Walmart's brick-and-mortar rivals thus are disadvantaged in competing with Walmart for the resale of Pepsi soft drinks because when they lower prices to attract consumers, Pepsi may respond with reduced promotional allowances and higher wholesale prices.

8.      A concrete example of Pepsi using promotional payments and allowances to advantage Walmart over its competitors in the resale of Pepsi soft drinks relates to Walmart's "Rollback" promotions. Rollback promotions involve temporary, heavily advertised price reductions intended to draw consumers to Walmart stores and drive Walmart's sales volume. As stated by Walmart's CEO, Walmart uses Rollback promotions "to communicate not only the reality of prices are coming down at some places, but the emotion or perception [Walmart] wants customers to have about [Walmart] being there for them . . . ."

9.      Pepsi supports Walmart's Rollback promotions by providing payments and allowances to fund Rollbacks on Pepsi soft drinks. In exchange for these payments and allowances, Walmart heavily advertises the reduced price of the Pepsi soft drinks on its shelves. Describing what Pepsi expects in connection with the Rollbacks, Pepsi's Vice President of Sales for Walmart explained that "in most cases it would be a display . . . that's primarily what we would require would be a display." Such displays may include dump bins (a freestanding container where customers can easily grab loose items), inline displays (displays integrated

directly onto the regular store shelves, highlighting specific products within the aisle), endcap displays (located at the end of aisles, these are highly visible and often used for showcasing new products or special promotions), gondola displays (shelving units that allow for displaying a variety of products across multiple levels), point-of-purchase displays (positioned to capture the attention of customers near a point of purchase), casestacker displays (designed to stack multiple cases of a product on top of each other, ideal for bulk items), shelf talkers (small signage attached to shelves to highlight promotions or product details), floor displays (free-standing displays that sit directly on the floor), and pallet displays (a large platform built on a pallet, used to showcase large quantities of a single product). Walmart places Pepsi soft drinks in these displays with large and prominent "Rollback" signs throughout its stores that are familiar to millions of Americans:



10.     Pepsi summarized its promotion-related efforts for Walmart in 2018: "[W]e invested ██████ in both [wholesale] cost and margin to improve your overall profitability and significantly improve your [retail] price gap versus rest of market. This was to drive an

advantaged position for Walmart in exchange for an advantaged position on [Walmart's modular

retail displays] to position both Walmart and PepsiCo for growth."

11.    Pepsi also provides data and other services to support Walmart's resale of Pepsi

soft drinks. For example, Pepsi continually monitors Walmart's retail price gap on Pepsi soft

drinks as compared with the rest of the market and shares that information with Walmart. When

Pepsi learns of promotions on Pepsi soft drinks by other retailers, Pepsi considers their potential

impact on Walmart's retail price gap—as well as the "leakage" that could occur were consumers

to take their business to Walmart's competitors—and at times takes action to protect the price

gap.

12.    For example, in 2019, Pepsi executives became aware of aggressive price cutting

by another retailer relating to 12 packs of Pepsi soft drinks. The Pepsi executives became

concerned that the price cutting would threaten Walmart's retail price gap. The Pepsi executives

also worried that Walmart would react poorly to news of the other retailer's prices being lower

than Walmart's, and might reconsider whether to run certain promotions on Pepsi soft drinks:

"They have now had multiple weeks of very aggressive pricing and [Walmart senior buyer] will

receive a Price Gap report just prior to when [Pepsi executive] is visiting with him about how we

move forward on 12pk [twelve-pack cartons of Pepsi soft drinks]."

13.    One of the executives wrote that Pepsi should react to the retailer's aggressive

pricing by funding a Rollback on Pepsi soft drinks for Walmart: "I see no way that we do not

start a planned [Walmart] Rollback ASAP to help with combatting the price gap challenge that

this [price report] will most definitely create."

14.    When Pepsi learns that other retailers are threatening Walmart's retail price gap,

Pepsi sometimes reduces or eliminates promotional support for those retailers to buttress

Walmart's retail price advantage in the resale of Pepsi soft drinks. Pepsi similarly will increase wholesale prices for such non-Walmart retailers with the expectation that to meet margin goals, those retailers will pass on the wholesale price increase to consumers by raising retail prices on Pepsi soft drinks. In other words, to enforce Walmart's price gap, Pepsi at times seeks to drive up retail prices for Pepsi soft drinks sold by Walmart's rivals.

15.    An internal Pepsi email from 2019 acknowledges an effort to advantage Walmart in the resale of Pepsi soft drinks while increasing competitors' costs: "Our proposal below is not solely focused on the cost increase but is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs / retails in order to drive growth on our mutual businesses." In an attached document, Pepsi describes a cost increase it imposed on other retailers, but not Walmart: "███████ cost increase in the rest of market. The cost increase, which is already in effect in rest of market, has not been passed on to Walmart."

16.    In short, Pepsi provides Walmart with price gap monitoring and policing services. With one hand, Pepsi provides Walmart with promotional payments and allowances meant to assist Walmart in selling Pepsi soft drinks below other retailers' prices. With the other hand, Pepsi reduces promotional payments and allowances to other retailers and ratchets up their wholesale costs to make it more difficult for these non-Walmart retailers to beat Walmart's retail prices for Pepsi soft drinks.

17.    Pepsi's willingness to reduce promotional payments, allowances, and services or increase wholesale costs for Walmart's competitors to advantage Walmart in the resale of Pepsi soft drinks is especially pernicious because rather than simply working with Walmart to reduce prices, Pepsi's actions have had the effect of *raising* prices for customers of competing retailers by increasing costs and prices for those retailers. Pepsi's favoritism toward Walmart harms

consumers who shop at those other retailers by forcing them to pay higher prices for Pepsi products, in violation of the RPA.

18.     The Federal Trade Commission brings this action to ensure that Pepsi ceases its practice of advantaging Walmart in the resale of Pepsi soft drinks, including through the use of discriminatory promotional payments, allowances, and services, while raising prices for other retailers and their customers. The FTC seeks an injunction that prohibits further discrimination by Pepsi against Walmart's competitors in the sale of Pepsi products and that will require Pepsi to make its promotional payments, allowances, and services available to all customers and purchasers—including small, independent businesses and other disfavored retailers—on proportionally equal terms, as required by law.

## II.     THE PARTIES

19.     Plaintiff Federal Trade Commission ("FTC") is an independent administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 et seq., with its principal offices in Washington, D.C. The FTC is vested with authority and responsibility to enforce, inter alia, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 2 of the Clayton Act, 15 U.S.C. § 13, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate federal court proceedings to enjoin violations of any law the FTC enforces, including Section 2 of the Clayton Act, as amended by the Robinson-Patman Act. Since its enactment in 1936, the FTC has brought over 1,400 actions to enforce the Robinson-Patman Act.

20.     Defendant Pepsi is an American multinational snack, food, and beverage manufacturer incorporated in North Carolina and headquartered in Purchase, New York. Pepsi conducts its business throughout the United States and across state lines, with dozens of production and distribution locations across the country. Founded in 1898, Pepsi owns or

controls multiple iconic beverage and food brands worth over $1 billion, including Pepsi-Cola, Frito Lay, Mountain Dew, Starbucks (under license), Gatorade, and Aquafina. In 2023, Pepsi reported global net revenues of over $91 billion.

## III.    JURISDICTION AND VENUE

21.    This complaint is filed and these proceedings are instituted under the provisions of Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, and Sections 5 and 13(b) of the Federal Trade Commission Act, 15 U.S.C. §§ 45 & 53(b).

22.    This Court has subject matter jurisdiction over this action pursuant to Sections 5(a) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a) & 53(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

23.    This Court has personal jurisdiction over Pepsi because Pepsi has the requisite constitutional contacts with the United States of America pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

24.    Pepsi's general business practices and the unfair methods of competition alleged herein are activities in or affecting "commerce" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44, and Sections 1 and 2 of the Clayton Act, 15 U.S.C. §§ 12-13.

25.    Pepsi is, and at all times relevant herein has been, a corporation, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

26.    Venue in this district is proper under 15 U.S.C. § 22; Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); and 28 U.S.C. §§ 1391(b), (c) and (d). Pepsi is found, resides, transacts business, and has agents in New York and in this District, and a portion of the affected commerce described herein has been carried out in New York and in this District. Pepsi has a significant presence throughout New York and this District.

**IV.    THE ROBINSON-PATMAN ACT**

27.    Subject to certain defenses, Section 2(d) of the Robinson-Patman Act, 15 U.S.C. § 13(d), makes it unlawful for a supplier engaged in commerce to pay or contract for the payment of anything of value, as compensation for any services or facilities, to one customer in connection with the resale of products or commodities unless such payments or allowances are "available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." 15 U.S.C. § 13(d).

28.    Section 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(e), also makes it unlawful for a supplier to discriminate in favor of one purchaser against another purchaser of a commodity bought for resale by furnishing any services or facilities connected with the resale of such commodity "upon terms not accorded to all purchasers on proportionally equal terms." 15 U.S.C. § 13(e).

29.    Each soft drink sold by Pepsi is a commodity within the meaning of Sections 2(d) and 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(d), (e).

30.    As detailed below, Pepsi has engaged in commerce, as defined in the Clayton Act, to discriminate in promotional payments, allowances, and services as between Walmart and Walmart's disfavored competitors—including small and independent retailers—in connection with the sale of Pepsi soft drinks of like grade and quality.

**V.    PEPSI'S BUSINESS ACTIVITIES**

**A.    Pepsi Sells Soft Drinks to Retailers Across the Country**

31.    The manufacture and sale of non-alcoholic soft drinks in the United States is a $150 billion industry. Soft drinks encompass two major categories of non-alcoholic beverages: (1) carbonated soft drinks ("CSD") and (2) non-carbonated soft drinks ("NCSDs"). NCSDs

9

include functional beverages (e.g., energy drinks), juice, sports drinks or "isotonics," dairy or dairy substitute drinks, tea, coffee, and bottled still water.

32.     Pepsi is one of the largest manufacturers and marketers of soft drinks in the United States. Pepsi is organized into seven divisions, including PepsiCo Beverages North America ("PBNA"). PBNA operates Pepsi's soft drink business in the United States and Canada. In 2023, PBNA generated $27.6 billion in revenue. Pepsi distributes its soft drinks to retailers through its bottler network, which comprises Pepsi's wholly owned bottling subsidiaries and several dozen franchise bottlers. Pepsi directly controls the wholesale pricing provided to its retailer customers by its wholly owned bottler subsidiaries.

33.     Pepsi's customers include retailers in several channels, such as grocery stores, drug stores, convenience stores, discount/dollar stores, mass merchandisers, and membership stores. Retailers purchase Pepsi products from Pepsi's bottlers and then re-sell those products to consumers. Retailers within each channel compete with one another. Retailers in one channel also often compete with retailers in other channels in the sale of soft drinks.

34.     Pepsi's brand recognition is universal. Many food and beverage retailers consider Pepsi soft drinks important to carry. Failing to carry Pepsi soft drinks can put them at a competitive disadvantage to retailers that do carry Pepsi products.

35.     On the other hand, Pepsi has recognized Walmart in its most recent 10-K Annual Report as its most important customer, the loss of which "would have a material adverse effect" on all of Pepsi's business. Walmart uses its power as one of the largest food and beverage retailers in the United States to negotiate national supply agreements directly with soft drink manufacturers, including Pepsi. To keep Walmart happy, Pepsi provides Walmart with a slew of

promotional payments, allowances, and services—benefits that Pepsi does not provide to Walmart's competitors on proportionally equal terms.

**B.**   **Pepsi Is Committed to Providing Walmart a Retail Price Advantage Over Other Retailers of Pepsi Soft Drinks**

36.    Walmart checks prices of retailers across all channels to determine whether competing retailers are selling the same products at a lower price. Walmart seeks to attract customers with retail prices that are lower than those of its competitors.

37.    Pepsi has made a "foundational commitment" to provide Walmart with a retail price advantage—a price gap or hedge—for Pepsi soft drinks compared to other retailers reselling the same Pepsi products. As Pepsi's Senior Director of Revenue Growth Management wrote to other Pepsi executives in 2021: "Delivering on Walmart hedge commitments is an aligned commercial strategy" across Pepsi's divisions. Evidence of Pepsi's and Walmart's retail price gap arrangement stretches back more than ten years and continues today.

38.    Pepsi uses several tools to maintain Walmart's retail price gap. First, Pepsi diligently monitors Walmart's retail prices for Pepsi soft drinks as compared with prices of other retailers. When Pepsi perceives that Walmart's price gap has narrowed, Pepsi seeks to influence retail prices and keep other retailers' prices for Pepsi soft drinks higher than Walmart's. Pepsi selectively (1) provides Walmart with promotional payments and allowances intended to reduce Walmart's retail prices for Pepsi soft drinks, (2) reduces promotional payments and allowances to other retailers in an effort to nudge their retail prices for Pepsi soft drinks above Walmart's, and (3) raises wholesale prices to non-Walmart retailers to make it more difficult to beat Walmart's retail prices on Pepsi soft drinks.

### 1. Pepsi Diligently Monitors and Polices Walmart's Retail Price Gap

39.     Pepsi continually monitors Walmart's retail prices for Pepsi soft drinks relative to Walmart's competitors on a short- and long-term basis. Pepsi "manage[s] [retail] price gap expectations to longer timeframes," such as yearly and half-year, but also views monthly and quarterly retail price gaps as "leading indicators."

40.     Walmart's price gap is an important metric that is regularly discussed within Pepsi. One Pepsi executive noted in an email that if the monthly or quarterly retail price gaps are "out of balance," Walmart "will pressure [Pepsi] for actions." Pepsi tracks two primary metrics related to the Walmart retail price gap arrangement: (1) price gap and (2) value hedge. Price gap is the "[c]omparison of average price at Walmart [versus] comparisons within a time frame weighted on Walmart volume for items." The value hedge, by contrast, is not weighted on Walmart's volume of items and represents a percentage difference in average retail price between Walmart and other retailers. Both metrics compare Walmart's retail prices for Pepsi soft drinks against retail prices for the "rest of market" or "ROM." "[R]est of market" includes "multi outlet" or "multi-channel" stores, and stores in the grocery, mass, club, drug, and dollar channels, but excludes Walmart. In the course of its business with Walmart, Pepsi also provides Walmart with results of its price gap analysis.

41.     For example, in October 2020, Walmart's senior buyer for the beverage business emailed Pepsi's Senior Director of Sales to complain that Pepsi "continue[d] to undermine [Walmart's] price leadership with our competition," citing a Target promotional circular featuring deep discounts on eight packs of Bubly 12-ounce cans. The Pepsi Senior Director responded, "[W]e understand the importance of finishing strong and that price leadership is key. With that context, the data we have indicates [Walmart's] price leadership with [B]ubly is advantaged versus the market and prior year . . . . [Walmart] has an advantaged price gap on

[B]ubly v[ersus] [rest of market]—and Target . . . ." Pepsi shared that Walmart's retail price "advantage" for the prior 4, 13, 26, and 52 weeks was as follows:



42.     Pepsi similarly tracks and seeks to correct for Walmart sales "leakage" to competing retailers resulting from low retail prices at those stores. As Pepsi's VP of Sales testified, "leakage" means that "through consumer panel data we see a percentage of consumers that are shifting outside of Walmart to another retailer[,]" and where Walmart is "the least competitive there's the greatest share of market loss."

43.     In January 2023, Pepsi prepared an evaluation in which it noted a connection between leakage and failing to maintain Walmart's price gap, writing that "[p]rice [g]ap [erosion was] [c]ontributing [t]o [a] [h]igh [d]egree [o]f [c]onversion [and] [l]eakage" from Walmart to other retailers of Pepsi soft drinks, with the "[m]ajority of the leakage and conversion losses to Grocery, Club, [and] Dollar Channels."

44.     Certain retailers are high on Pepsi's radar as stores that often "self-fund" promotions on Pepsi soft drinks to attract customers in a way that could undermine Walmart's price gap. In internal documents, Pepsi refers to these price-cutters as "offenders." Pepsi and Walmart monitor these retailers' pricing closely for signs that their promotions are threatening the price gap advantage in the resale of Pepsi soft drinks that Pepsi has committed to Walmart that it will help maintain. When Pepsi or Walmart sees sustained price-cutting by these retailers, Pepsi attempts to reverse any leakage and restore Walmart's retail price gap advantage.

45.     The preferential retail price monitoring and policing that Pepsi provides to Walmart confers on Walmart an advantage over the retailers it competes with in the resale of Pepsi soft drinks across the country.

46.     Pepsi does not provide retail price gap monitoring and policing for all other purchasers of its soft drinks on proportionally equal terms.

> ### 2.  Pepsi Manipulates Promotional Payments and Allowances to Reduce Walmart's Retail Prices While Increasing Prices for Others

47.     Pepsi provides Walmart with promotional payments and allowances intended promote the resale of Pepsi soft drinks by Walmart and to lower Walmart's retail prices for Pepsi soft drinks compared to those of competing retailers. By their very nature, these payments and allowances from Pepsi to help Walmart achieve lower retail prices than other retailers are not available to the competing retailers.

48.     Pepsi frequently provides payments and allowances to Walmart in connection with Walmart's Rollback promotions. These Rollback promotions support Walmart's resale of Pepsi soft drinks and seek to maintain Walmart's retail price gap relative to Walmart's competition in the resale of Pepsi soft drinks. Walmart's Rollbacks are a promotional tool involving eye-catching advertising displays, multimedia advertising, and advantaged in-store placement coupled with temporary price reductions. When Pepsi identifies price-gap concerns relating to its soft drinks, it may "adjust rollback levers" by increasing the magnitude or duration of Rollback-associated promotional payments and allowances it gives to Walmart.

49.     In exchange for these payments and allowances and to support the resale of Pepsi soft drinks, Walmart typically will feature Pepsi's soft drinks in its stores with advertisements, flashy Rollback displays, and better placement. These promotional services and facilities from Walmart have a substantial, measurable effect of driving the resale of Pepsi soft drinks to

consumers at Walmart stores, as illustrated by the below Pepsi presentation touting the impact of "endcap" displays:



Source: Retail Link L26 Weeks                              11

50.     One example from December 2021 illustrates how Pepsi identifies threats to Walmart's price gap from other retailers, and responds with payments and allowances for Rollback promotions to maintain Walmart's retail-price advantage.

51.     On December 2, 2021, Pepsi's Senior Director of Sales for Walmart highlighted concerns regarding Walmart's price gap for Pepsi soft drinks relative to other retailers. He wrote in an internal email: "[Revenue Growth Management] agreed that we have near term price gap risk factoring Grocery's forecasted 8oz Growth with the anticipated architecture." As an example of a local market where Pepsi feared the price gap might erode, the Senior Director wrote, "[the] gap will most likely not improve in the near term in the Richmond-Raleigh-CLT corridor as [grocery chains] are battling each other for [share of market]." On December 8, 2021, the Senior Director circulated a presentation that identified several additional geographic areas where Pepsi executives believed Walmart's retail price gap might be at risk.

52.     The next day, Pepsi's Senior Director for Revenue Management circulated a set
of Pricing Council talking points to several Pepsi executives, including Pepsi's Senior Director
of Sales for Walmart. The Pricing Council is an organization within Pepsi responsible for
aligning pricing strategy and pricing decisions across customer accounts. The Pricing Council
includes Pepsi's senior vice presidents, the commercial senior vice presidents of each division,
the relevant account teams, the finance organizations, and sometimes the chief commercial
officer. The talking points stated, among other things:

> "The purpose of the Pricing Council
>
> - Create awareness of hedge erosions. . .
>
>   *. . .*. . .*
>
> - Discuss decision tree… **1. Raise non-[Walmart] customers
>   through Q1 to prevent price risk 2. Manage hedge with
>   [Walmart] rollbacks**
>
> - Align on preferred approach to correct hedge issues. . ."
>
> (emphasis added)

53.     During the subsequent Pricing Council meeting, "[f]eedback was consistent that
moving Grocery up to correct Hedge is not feasible because of competitive dynamics or previous
commitments on price increase timing." Thus, Pepsi executives discussed "adjusting [Walmart]
[Rollback] depth in select areas as the lever to correct" Walmart's price gap; in other words,
increasing the amount of promotional payments or allowances for Rollbacks to push Walmart's
retail prices below the prices of its competitors in the resale of Pepsi soft drinks.

54.     For Pepsi's South Division, which focuses on sales in the southeastern United
States, Pepsi's Senior Director of Sales for Walmart proposed three "zone specific" promotional
moves for Walmart: (1) reduced Rollback price on beverage multi-packs, (2) extension of a

Rollback promotion by two weeks for 12 oz cans, and (3) a reduction in Rollback price for 12 oz cans. Pepsi employees believed that increased promotional allowances for Rollbacks were necessary to "[g]et ahead of price gap challenges by showing [Walmart] we are addressing in key spots and avoid [Walmart] forcing national move."

55.    As a result, in January 2022, Pepsi gave Walmart a deepened and extended promotional allowance for Rollbacks with the express purpose of helping Walmart improve its price gap vis-à-vis other retailers competing to sell Pepsi soft drinks. Pepsi emphasized internally that "the above actions are intended to improve [Walmart's] gap performance [on our products]; however, to see sustained progress, in some cases, additional [rest of market] actions will be needed."

56.    To maintain the price gap and advantage Walmart over its competitors in the resale of Pepsi soft drinks, Pepsi also provides Walmart with promotional payments and allowances beyond those associated with Rollbacks, including but not limited to short-term "Save Even More" deals, online coupons and advertisements, and other merchandising opportunities.

57.    Because Pepsi uses promotional payments and allowances to keep Walmart's retail prices below those of Walmart's competitors, Pepsi by definition cannot make the same promotional payments and allowances available to all other retailers on proportionally equal terms. But Pepsi goes further than simply providing these benefits disproportionately to Walmart—it actively cuts promotional payments and allowances to Walmart's competitors in an effort to keep Walmart's retail prices for Pepsi soft drinks comparatively low.

58.    An example of Pepsi strategizing to raise prices of another retailer in response to erosion of Walmart's price gap involves the supermarket retailer Food Lion. Food Lion is a

regional supermarket chain that operates over 1,000 stores across 10 states. In 2022, Pepsi believed that Food Lion had "heavily indexe[d]" its retail prices "against retails at [Walmart] and Kroger" and "set[] retails relative to these competitors." Pepsi characterized Food Lion as the "worst offender" on the price gap for "beating [Walmart] in price."

59.     As a result of Food Lion threatening Walmart's price gap, Pepsi created a plan to nudge Food Lion's retail prices on Pepsi products upward by reducing promotional payments and allowances to Food Lion and raising other costs for Food Lion. The plan advised that Pepsi "must commit to raising rate [on Food Lion] faster than market by minimum ███ annually." The plan included a multi-year roadmap that recommended a combination of (1) reductions in promotional payments and allowances and (2) wholesale price hikes to raise Food Lion's dead net price, or price including all discounts, allowances, and other charges:

- "Raise rate across core [carbonated soft drink] packages" to "close [dead net price] gap on 12 [pack]";

- "[R]educe gap on promos to market by 1 [point]," for example, "████████ ████";

- "[R]educe holiday [promotion] weeks from ███ days";

- "Raise promo [dead net price] to match market must buy economics"; and

- "Delayer ads… scale back on promoting multiple core packages in the same week."

60.     In the end, Pepsi implemented a plan incorporating a reduction in promotional payments and allowances for Food Lion that involved "[b]uilding to ███ of [dead net price] appreciation [at Food Lion]" to correct Food Lion's encroachment on Walmart's price gap.

61.     As of February 2023, Pepsi estimated that Food Lion's CSD retail pricing was ████████ than the previous year, and it was projected to "finish closer to ███████."

18

Nonetheless, even with these price increases, Pepsi leadership continued to push its Food Lion

sales team to "begin to CLOSE the gap" because "[w]e absolutely have to demonstrate progress

[to Walmart] in the immediate term."

## VI.    PEPSI'S DISFAVORED PURCHASERS AND CUSTOMERS COMPETE WITH WALMART TO SELL PEPSI SOFT DRINKS

62.     Walmart operates over 4,700 stores in every U.S state and nearly every U.S.

Metropolitan Statistical Area ("MSA") as defined by the U.S. Office of Management and

Budget. Walmart purchases Pepsi soft drinks and resells them to consumers in substantially all of

its stores.

63.     Walmart competes with brick-and-mortar retailers across the United States in the

resale of Pepsi soft drinks. These retailers include national and regional chains such as Meijer,

Albertson's, Hy-Vee, Stop & Shop, Kroger, King Sooper, Publix, Food Lion, Fred Meyer,

Raley's, H-E-B, Food 4 Less, Smith's, Jewel, Price Chopper, Giant Eagle, Bashas, Big Y, Fiesta,

Brookshire, Supervalu, Wegmans, Weis, Tops, Target, BJ's, Rite Aid, Walgreens, Family

Dollar, Dollar General, and Dollar Tree, in addition to numerous small and independent retailers.

64.     Walmart competes with these brick-and-mortar retailers ("Disfavored Retailers")

in the sale of Pepsi soft drinks of like grade and quality to consumers in every U.S. state and in

every MSA. Walmart and the Disfavored Retailers compete across the full range of Pepsi's soft

drink offerings, including Pepsi's major brands such as Pepsi, Mountain Dew, Starry, Bubly,

Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks. Walmart and the Disfavored

Retailers compete and have competed to sell Pepsi soft drinks to the same consumers in the same

geographic areas at the same time.

65.     Each of these Disfavored Retailers is a customer or purchaser of Pepsi soft drinks

within the meaning of Sections 2(d) and (e) of the RPA.

66. Pepsi provides Walmart with the promotional payments, allowances, and services alleged herein in connection with the sale or offering for sale of Pepsi soft drinks in an effort to promote Walmart's resale of Pepsi soft drinks and lower Walmart's retail prices for those soft drinks compared to the retail prices of the Disfavored Retailers for those same products. Pepsi does not make promotional payments, allowances, and services available to all of the Disfavored Retailers on proportionally equal terms. Indeed, the price gap that Pepsi and Walmart openly discuss draws its value from the difference between the way Pepsi treats Walmart as compared with the Disfavored Retailers, whose retail prices serve as Pepsi's reference for the price to beat.

67. Pepsi provides these discriminatory promotional payments, allowances, and services to give Walmart an advantage over the Disfavored Retailers in the resale of Pepsi soft drinks, and not in a good faith attempt to meet the equally low price, payments, allowances, or services furnished by any competitor of Pepsi.

## VII.    PEPSI IS ENGAGED IN COMMERCE

68. In general and in connection with the unlawful conduct alleged herein, Pepsi has engaged and is now engaging in commerce as defined in the Clayton Act as amended by the RPA.

69. Pepsi is engaged in the production and sale of soft drinks in interstate commerce. Pepsi's soft drinks are generally made from concentrates containing raw ingredients drawn from all over the world. In an intricate manufacturing process, Pepsi purchases those raw ingredients, aluminum, polyethylene terephthalate ("PET"), and other materials from interstate and international suppliers, manufactures concentrate in facilities around the United States, and distributes the concentrate across state lines to its wholly owned and independent bottlers. Those bottlers mix the concentrate with water and bottle Pepsi's soft drinks in aluminum cans, PET bottles, and other containers before distributing Pepsi soft drinks locally and regionally to

20

retailers in each of the United States and the District of Columbia, in many cases across state lines, in a continuous flow of commerce to the more than 4,700 Walmart stores located in each of the United States and to substantially all of Walmart's competitors in the sale of Pepsi soft drinks, including the Disfavored Retailers.

70.     Pepsi has ultimate control over the prices and terms under which it sells and distributes its products. Pepsi often negotiates the terms of its sales, as well as the terms of promotional payments, allowances, and services for its customers, at a national or regional level. With regard to its dealings with Walmart, Pepsi's negotiations relating to the terms of its sales and promotional payments, allowances, and services typically take place at the national or regional (multi-state) level.

71.     Walmart and many of the Disfavored Retailers engaged in the retail sale of Pepsi's soft drinks similarly are interstate chains that operate their businesses across state lines.

## VIII.  PEPSI'S DISCRIMINATORY PRACTICES HARM COMPETITION

72.     By providing discriminatory promotional payments, allowances, and services to Walmart while failing to make those benefits available to Walmart's competitors in the retail sale of Pepsi soft drinks on proportionally equal terms, Pepsi is engaged in conduct that violates Sections 2(d) and 2(e) of the RPA and is therefore *per se* illegal, regardless of its competitive impact.

73.     Nevertheless, Pepsi's discriminatory conduct has resulted in harm to competition. As a result of Pepsi's favoritism toward Walmart, the Disfavored Retailers have sold lower volumes of Pepsi soft drinks than they would have sold in the absence of the discriminatory conduct and have made lower profits on the products they did sell. Pepsi's conduct has caused the Disfavored Retailers and the American consumers who are their customers to pay higher prices for Pepsi soft drinks over the course of years.

## COUNT ONE

### (Section 2(d) of the Robinson-Patman Act, 15 U.S.C. § 13(d))

74.    Each of the allegations in paragraphs 1 through 73 is incorporated in this Count One as if fully set forth herein.

75.    In consideration for promotional services and facilities furnished by Walmart in connection with the sale and offering for sale of Pepsi soft drinks, Pepsi has provided Walmart with the promotional payments and allowances alleged herein. These payments and allowances, intended to provide Walmart with a retail price advantage over its competitors in the resale of Pepsi soft drinks, were not and are not made available on proportionally equal terms to all of the Disfavored Retailers, who compete and have competed with Walmart in the sale and distribution of Pepsi soft drinks of like grade and quality at all relevant times. This discriminatory provision of promotional payments and allowances violates Section 2(d) of the RPA, 15 U.S.C. § 13(d).

76.    Pepsi's violation of Section 2(d) of the RPA will continue in the absence of the relief herein requested.

## COUNT TWO

### (Section 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(e))

77.    Each of the allegations in paragraphs 1 through 73 is incorporated in this Count Two as if fully set forth herein.

78.    Pepsi has furnished Walmart with services in connection with Walmart's sale and offering for sale of Pepsi soft drinks. Specifically, Pepsi has provided diligent monitoring and policing of Walmart's retail price gap, intended to assist Walmart in maintaining a retail price advantage as compared with Walmart's competitors in the resale of Pepsi soft drinks. Pepsi does not make and has not made these services available on proportionally equal terms to all of the

Disfavored Retailers, who compete and have competed with Walmart in the sale and distribution of Pepsi soft drinks of like grade and quality at all relevant times. This discriminatory provision of services violates Section 2(e) of the RPA, 15 U.S.C. § 13(e).

79.    Pepsi's violation of Section 2(e) of the RPA will continue in the absence of the relief herein requested.

## COUNT THREE

### (Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45)

80.    Each of the allegations in paragraphs 1 through 79 is incorporated in this Count Three as if fully set forth herein.

81.    The acts and practices of Pepsi set forth in paragraphs 1 through 79 above constitute unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and will continue in the absence of the relief herein requested.

## PRAYER FOR RELIEF

WHEREFORE, the FTC respectfully requests that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and its own equitable powers:

1.    Enter final judgment against Pepsi;

2.    Grant the FTC permanent injunctive relief to prevent future violations of the RPA and the FTC Act by Pepsi;

3.    Order Pepsi to cease and desist from unlawfully discriminating in favor of one purchaser against another within the meaning of Sections 2(d) and 2(e) of the RPA; and

4.    Order such other and further relief as the Court deems just and proper.

Dated: January 17, 2025

Respectfully submitted,

_____

NICOLAS STEBINGER
(NY Bar No. 4941464)
Senior Trial Counsel
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Phone: (202) 326-2688
Email: nstebinger@ftc.gov

ERIK HERRON
(NY Bar No. 5561543)
Acting Assistant Regional Director
Federal Trade Commission
90 7th Street, Suite 14-300
San Francisco, CA 94103
Phone: (202) 326-3535
Email: eherron@ftc.gov

*Attorneys for Plaintiff Federal Trade*
*Commission*